# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**UNITED STATES OF AMERICA,**

**Plaintiff,**

              **Case No. 2:09-cr-242**

 v.             **Judge Sargus**

**CLIFTON M. JEFFERSON,**

**Defendant.**

## OPINION AND ORDER

   Before the Court is Defendant's Motion to Suppress Evidence. (Doc. 30.)  For the reasons set forth below, the Motion is denied.

**I.**

   Defendant has been indicted and charged with possessing a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g).  (*See* Indictment.)  Officers of the Columbus Division of Police allegedly discovered a Romarm, Model Wasr-10 assault rifle (commonly known as and referred to hereinafter as an "AK-47") while executing a search warrant at 855 Byron Avenue in Columbus on February 12, 2009.  The officers had sought the warrant for the purpose of obtaining evidence related to a homicide/arson that had occurred at 1770 Devonshire Road in Columbus on January 27, 2009.  (*See* Government Ex. 1, ¶ 2.)  At the Devonshire Road crime scene, officers had discovered a blood trail and had obtained a positive DNA match to the Defendant.  (*See* Government Ex. 1, ¶ 2.)  Tamara Smith, who was present during the homicide, had told police that along with her brother, Tommy Smith, another man, whose identity was unknown to her, was also involved in the homicide.  (Government Ex. 2, at

4.) According to Tamara Smith, this man had been wounded in the hand during the commission

of the homicide, leaving the blood trail that was subsequently discovered by police.

(Government Ex. 2, at 4.) On January 29, 2009, Defendant and his girlfriend, April Vizcarra,

contacted the Columbus Division of Police and claimed that Defendant had been shot in the hand

when a man attempted to rob him on Main Street in Columbus. (*See* Government Ex. 4, at 1.)

When filing this report, Defendant indicated to the officers that he resided at 855 Byron Avenue.

(*See* Government Ex. 4, at 2.) Before the search warrant was issued, Vizcarra admitted to

Columbus police that the story about the Main Street robbery had been concocted by her and the

Defendant. (Government Ex. 3, at 1.) According to her, the Defendant had shown up at her

house with a gunshot wound, which he indicated had been received while he had been robbed at

a bar, and, as the pain became too much for him, he devised a plan to falsely report a robbery so

that he could obtain treatment for his wound. (Government Ex. 3, at 1.)

      On February 11, 2009, Detective Timothy Mounts executed an affidavit filed in support

of an application for a search warrant of the Defendant's residence. The warrant was thereafter

issued by the Franklin County Municipal Court. Defendant now moves to suppress the AK-47,

which was apparently not connected to the homicide, and other evidence found by police at 855

Byron Avenue on the ground that the affidavit used to apply for the search warrant failed to

establish probable cause, or on the alternative ground that the affidavit contained information that

the affiant police officer knew was incorrect or for which the officer exhibited a reckless

disregard for the truth. The Government responds by asserting that the affidavit sufficiently

supports a finding of probable cause on the part of the issuing municipal judge.

      The affidavit contains three paragraphs. In the first paragraph, Mounts averred that he

had good cause to believe that evidence of the criminal offense of murder, including weapons, implements, blood, "property which may identify or trace the victim or suspects," and "samples of materials the subjects may have carried from the scene on their person," were located at 855 Byron Avenue. (*See* Government Ex. 1, ¶ 1.)  In the second paragraph, Mounts recited the facts upon which the beliefs enumerated in the first paragraph were based.  These facts are as follows:

> On January 27th, 2009 at 5:00pm Tamara Smith entered the residence located at 1770 Devonshire Road with purpose to assist in an Aggravated Robbery.  Clifton M. Jefferson and Thomas Smith then robbed Jackie Hagwood at that location. Clifton Jefferson and Thomas Smith shot Jackie Hagwood several times causing his death.  The body of Jackie Hagwood and the entire mentioned residence was later purposely set on fire.  Clifton Jefferson received a wound, possibly a gunshot wound to his left hand during the robbery.  A trail of blood drops was found leaving the rear door of 1770 Devonshire Road and leading beside the residence located at 1762 Devonshire Road.  The Scene was secured and the blood evidence was collected by Columbus Police Crime Search detectives.  The evidence was submitted to the Columbus Police Crime Laboratory for DNA analysis.  DNA was extracted and the DNA standard was entered into CODIS for comparison.  CODIS responded with an offender match.  The offender match was for Clifton M. Jefferson DOB: 9/25/78.  On January 29th, 2009, Clifton Jefferson along with April Vizcarra reported a false robbery to the Columbus Police.  Mr. Jefferson stated that he had just been robbed in the area of 3369 E. Main Street.  Mr. Jefferson reported that he had been shot in the hand during the robbery.  Clifton Jefferson and April Vizcarra reside at 855 Byron Avenue.

(Government Ex. 1, ¶ 2.)  The third paragraph reasserted Mounts' belief that evidence of the homicide would be discovered at the Byron Avenue address.  (*See* Government Ex. 1, ¶ 3.)

## II.

The Fourth Amendment to the Constitution of the United States provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  In cases where officers of the government violate the Fourth Amendment rights of

individuals in conducting searches or seizures, the government may be prohibited from using

evidence obtained during such illegal searches or seizures against those whose rights have been

violated. *See generally Mapp v. Ohio*, 367 U.S. 643 (1961). However, in the context of search

warrants, the Supreme Court has recognized a narrow exception to the exclusionary rule in cases

in which officers acting in good faith rely upon a search warrant which, while later found

defective, was otherwise objectively reasonable. *See United States v. Leon*, 468 U.S. 897, 922

(1984). At issue here then, is whether the search warrant issued by the Columbus municipal

judge was defective under the Fourth Amendment, and if so, whether evidence obtained by

police in executing the warrant should then be excluded from the Government's case against

Defendant.

### A.     DEFENDANT'S MOTION TO SUPPLEMENT

As an initial matter, also before the Court is Defendant's Motion for Leave to File

Supplement to Motion to Suppress Evidence. (Document 38.) As the Government indicated at

the suppression hearing that it did not object to this motion, the Court grants the motion and will

consider the additional materials submitted by Defendant as part of Defendant's Motion to

Suppress Evidence.

### B.     DEFENDANT'S *FRANKS* ARGUMENT

Defendant asserts that under the Supreme Court's decision in *Franks v. Delaware*, 438

U.S. 154 (1978), the evidence found during the search of 855 Byron Avenue should be

suppressed because the affidavit accompanying the application for the search warrant contained

knowingly false statements, and, without these statements, the affidavit would not support a

finding of probable cause by the issuing judge. In *Franks*, the Supreme Court held that

4

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id.* at 155-56. Specifically, Defendant contends that the statements in the affidavit that Defendant was involved in the homicide were false because, at the time the affidavit was signed, Tamara Smith had not yet identified Defendant in a photo array and that witnesses at the scene of the murder had not been able to identify Defendant and had given inaccurate descriptions of those involved. Defendant also asserts that the statement in the affidavit that Defendant resided at 855 Byron Avenue was false and the detective knew it to be false because April Vizcarra had previously stated that Defendant was only an occasional guest at her home and not a resident there.

The Court finds Defendant's arguments unpersuasive. Defendant has adduced no evidence that Mounts or Detective Michael Friend, who worked closely with Mounts in preparing the affidavit, intentionally used false statements in the affidavit or proceeded with a reckless disregard for the truth. To the contrary, from evidence admitted at the suppression hearing and in exhibits to the Parties' briefs, it is clear that Detectives Mounts and Friend had reasonable grounds to believe that the statements made in the affidavit were true. For the statement regarding Defendant's involvement in the homicide, while no witness, including Tamra Smith, had identified the Defendant at the time the warrant was issued, Smith had stated that the unidentified person had been shot in the hand. (Government Ex. 2, at 4.) This, coupled with the facts that Defendant's blood was found at the scene, and Defendant's report of being shot in the hand, provided a solid basis for the detectives to believe in Defendant's involvement

5

in the homicide.  As to the statement regarding Defendant's residence at 855 Byron Avenue,

evidence adduced at the suppression hearing indicates that Defendant himself represented to

Detective Anthony Klette that he resided at 855 Byron Avenue when he falsely reported the Main

Street robbery.  Thus, it was reasonable for Mounts and Friend to believe that the statement in the

affidavit regarding Defendant's residence was true.  Accordingly, the Court concludes that the

Defendant has failed to demonstrate that the statements were false or made with reckless

disregard for the truth.

      **C.**     **DEFENDANT'S FACIAL ATTACK OF THE AFFIDAVIT**

      Defendant next contends that, on its face, the affidavit used to obtain the search warrant

does not support a finding of probable cause.  In determining whether an affidavit establishes

probable cause justifying the issuance of a search warrant, a judge or magistrate must find that

"given all the circumstances set forth in the affidavit before him . . . there is a fair probability that

contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S.

213, 238 (1983).  "To justify a search, the circumstances must indicate why evidence of illegal

activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th

Cir. 2004)(en banc).  There must be a "'nexus between the place to be searched and the evidence

sought.'" *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)(quoting *United

States v. Alix*, 86 F.3d 429, 435 (5th Cir. 1996)).

      "When determining whether an affidavit establishes probable cause, [courts] look only to

the four corners of the affidavit; information known to the officer but not conveyed to the

magistrate is irrelevant." *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010).  Finally, in

reviewing the affidavit, the Court must show great deference to the probable cause determination

of the municipal judge, but at the same time "insist that the [judge] perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006)(quoting *Aguilar v. Texas*, 378 U.S. 108, 111 (1964), *abrogated on other grounds by Gates*, 462 U.S. 213).

Here, Defendant contends that the affidavit is insufficient to establish probable cause in two respects. First, Defendant asserts that the affidavit makes broad, conclusory statements concerning Defendant's involvement in the homicide without providing the basis for such a conclusion or, to the extent such conclusion was derived from information provided by informants, without establishing the veracity or reliability of such informants. Second, Defendant maintains that the affidavit failed to establish a nexus between the evidence sought and the 855 Byron Avenue address. The Government responds by asserting that the affidavit is sufficient because it demonstrates probable cause that Defendant was involved in the homicide and evidence of the crime would be found at Defendant's residence at Byron Avenue.

### 1.    Defendant's Involvement in the Homicide

The Court agrees that one very serious flaw with the affidavit is that Detective Mounts failed to explain the source of most of the facts presented.[1]  The first several sentences of the second paragraph of the affidavit read as follows:

> On January 27th, 2009 at 5:00pm Tamara Smith entered the residence located at 1770 Devonshire Road with purpose to assist in an Aggravated Robbery.  Clifton M. Jefferson and Thomas Smith then robbed Jackie Hagwood at that location. Clifton Jefferson and Thomas Smith shot Jackie Hagwood several times causing his death.

---

[1]For example, the statement "Clifton Jefferson received a wound, possibly a gunshot wound to his left hand during the robbery[,]" is conclusory and does not specify what sources of information allowed the police to reach that conclusion.

7

(Government Ex. 1, ¶ 2.). While it is likely that the police derived this information from their interview of Tamara Smith, there is nothing in the affidavit that indicates the source. Similarly, the statements that Defendant was shot in the hand during the robbery and that the Defendant and Vizcarra filed a *false* police report are made without reference to the sources of that information. (*See* Government Ex. 1, ¶ 2.) It is likely that the information related to Defendant being shot again came from Tamra Smith and that information that the report was false came from Vizcarra. (*See* Government Exs. 2, at 4, & 3, at 1.) While the police had personal knowledge that Defendant had filed the police report, they only learned that it was false through their interview with Vizcarra.

> The Supreme Court has stated that
>
> an informant's "veracity," "reliability" and "basis of knowledge" are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . . Rather . . . , they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.

*Gates*, 462 U.S. at 230. The Sixth Circuit has held that affidavits "based upon personal observation of criminal activity by a confidential informant who has been named to the magistrate and who, as the affidavit avers, has provided reliable information to the police in the past about criminal activity . . . can be sufficient for a magistrate to find probable cause. . . ." *United States v. Allen*, 211 F.3d 970, 971 (6th Cir. 2000)(en banc). In this case, Tamara Smith is perhaps best characterized as a co-participant in the homicide as opposed to an informant, and April Vizcarra could potentially also be considered a co-participant in filing the false police report. In cases where applications for search warrants are supported by the statements of

8

accomplices, "courts generally apply a different standard to a co-participant than to other, more typical informants." *United States v. Patterson*, 150 F.3d 382, 385 (4th Cir. 1998). "[W]hen a codefendant has admitted guilt to the core crime, there is enough indication of 'reasonably trustworthy information' to meet the requirement of probable cause." *Id.* at 385-86 (citing *Craig v. Singletary*, 127 F.3d 1030, 1045 (11th Cir. 1997)(en banc)).  This lower standard for establishing trustworthiness is based on the idea that statements inculpating the co-participant in a crime are less likely to be false.

The problem, however, with Mounts' affidavit in regard to the above facts is the absence of the source of those facts.  "An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause . . . ." *Gates*, 462 U.S. at 239.  "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Id.*  Even if Tamara Smith and April Vizcarra could best be characterized as co-participants, it is not relevant that the threshold for determining the trustworthiness of information provided by co-participants in the probable cause calculus may be lower than that for confidential informants.  That is because absent an identification in the affidavit of Tamara Smith or Vizcarra as the source of certain information, the municipal judge was precluded from even placing them into one of the various categories, e.g. as informants, witnesses, or accomplices, that are useful in assessing reliability of information.

The Court finds, however, that even if these facts were to be stricken from the affidavit, there would still be enough other information in the affidavit upon which to find probable cause of Defendant's *involvement* in the homicide.  The remaining facts include (1) there had been a

9

homicide on January 27, 2009 at 1770 Devonshire Road; (2) the death of the victim had been caused by firearm; (3) one of the victim's assailants had been wounded and the police had discovered a trail of blood leading away from the Devonshire Road crime scene; (4) the blood had been matched, through DNA analysis, to Defendant; and (5) on January 29, 2009, Defendant filed a police report, through which police learned that Defendant had been shot in the left hand.

### 2.    The Nexus Between the Evidence Sought and 855 Byron Avenue

The Court now turns to the issue of whether the affidavit established a sufficient nexus between the evidence sought and 855 Byron Avenue. The Court finds that the statement "Clifton Jefferson and April Vizcarra reside at 855 Byron Avenue" provides a sufficient nexus at least for some of the types of evidence sought in the affidavit. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). "The fact that there is probable cause to arrest a person for a crime does not automatically give police probable cause to search his residence or other area in which he has been observed for evidence of that crime." *United States v. Savoca*, 739 F.2d 220, 224 (6th Cir. 1984), *rehearing granted*, 761 F.2d 292 (1985).

Here, the warrant does not expressly state why the police believed that the evidence sought would be located at 855 Byron Avenue. The Sixth Circuit, however, has recognized that in some instances it is acceptable for magistrates or judges to infer that a nexus exists between the place to be searched and the evidence sought. Whether such an inference is permissible depends upon "the type of crime being investigated, the nature of the things to be seized, the

10

extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places." *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985). For instance, the Sixth Circuit has ruled that in cases involving drugs, "an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008). However, the Sixth Circuit has also noted that in cases involving drugs where the inference was permissible "the affidavits contained an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes—namely, the independently corroborated fact that the defendants were known drug dealers at the time the police sought to search their homes." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006); *See also Williams*, 544 F.3d at 688.

In addition to cases involving drug trafficking, the Sixth Circuit approved the issuance of warrants drawing an inference of a nexus between a home and business records involving illegal activities. *See, e.g., United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006)("Defendant's argument that there was no nexus between the locations searched, his home and his businesses, and the evidence sought is without merit. One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home. Likewise, personal financial records are also usually stored at a person's home or place of business.").[2]

The present case, however, is one in which evidence of a homicide, as opposed to crimes

---

[2]In addition to drug and business cases, the Sixth Circuit has also approved an inference that child pornography would be found on a computer at a residence associated with an email address. *See, e.g., United States v. Terry*, 522 F.3d 645, 648 (6th Cir. 2008).

11

involving drugs or illegal business activities, was sought by the police. In contrast to drug

trafficking and illegal business activity cases, some courts have declined to infer a nexus between

the home of a defendant and the murder weapon in homicide cases. In *United States v. Bethal*,

No. 05-6524, 2007 WL 2286541 (6th Cir. Aug. 9, 2007), an unreported case from the Sixth

Circuit, Louisville, Kentucky police obtained a warrant to search the residence of Wilbert Bethal,

who had been implicated in a gang-related homicide. *Id.* at \*1-\*2. The warrant was issued

approximately two months after the homicide and authorized the police to search for several

types of guns, ammunition for those guns or other guns, marijuana, and "all contraband, other

drugs, and evidence of gang affiliation." *Id.* at \*2. The affidavit used to obtain the search

warrant contained sworn testimony linking Bethal to the homicide, together with statements that

he was a gang-member, and that he lived at the address to be searched. *See id.* The Court found

this information insufficient to support a finding of probable cause that the items sought would

be located at Bethal's residence. *See id.* at \*7. In so holding, the Court noted the sometimes

permissible inference in cases involving drug dealers ("[w]e have observed that suspects

identified as drug dealers routinely keep drugs at home"), but also implied that an inference

involving murder weapons being found at a suspect's residence would be less likely to be valid

because "persons accused of murders often dispose of the guns utilized in the crime soon

afterward." *Id.*

    In *United States v. Charest*, 602 F.2d 1015 (1st Cir. 1979), the First Circuit was presented

with a very similar factual situation as at issue in the present case—a firearm was discovered at

the defendant's residence while the defendant was being investigated for murder, and the

defendant was subsequently charged with being a felon in possession of a firearm. *Id.* at 1015-

16. The affidavit supporting the application for a warrant to search Charest's residence provided detailed information concerning Charest's involvement in the murder (from a confidential informant whose reliability was attested to by the affiant detective), but failed to provide any information linking Charest to the residence, or any information as to why the affiant detective believed that the sole item sought, a .38 caliber handgun, would be found at the residence. *Id.* at 1016-17. The First Circuit found that the affidavit provided no nexus between the item sought and the place to be searched, and also found that a magistrate could not infer that the handgun would likely be found at a murder suspect's residence on the basis that the opposite inference—that a murderer would not keep a murder weapon linking himself to the crime at home—would be more likely. *Id.* at 1017 ("Common sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone.").

In contrast to *Charest* and *Bethal*, other Circuits have found reasonable an inference that weapons associated with a crime may be found at a suspect's residence. For instance, in *United States v. Bowers*, 534 F.2d 186 (9th Cir. 1976)(per curiam), which involved the murder of a park ranger, the Ninth Circuit ruled that an inference could be reached from the extremely detailed affidavit at issue that certain pieces of evidence, including possibly weapons, would be found at a residence connected to the defendants. *See id.* at 192-93. In *United States v. Anderson*, 851 F.2d 727 (4th Cir. 1988), the Fourth Circuit ruled that it would be reasonable for a magistrate to conclude that a weapon connected to a murder would be located at the suspect's residence.[3] *Id.*

---

[3] The Court notes that *Anderson* may be distinguishable from *Charest* in that, in *Anderson*, police presented evidence in their warrant application that the defendant had attempted to sell the murder weapon and a silencer to three informers. *Anderson*, 851 F.2d at 728. This direct evidence that the defendant still possessed the murder weapon would thus trump the assumption that a murder suspect would likely dispose of a firearm used to commit the murder.

13

at 729.

In the present case, the Court need not enter the fray between those who believe murder suspects discard their weapons and those who believe that the opposite is true. In the Court's view, the DNA match in this case permitted the issuing municipal judge to reasonably infer that evidence from the crime scene, such as DNA matter from the victim, gun-shot residue, blood spatter, hair, skin flakes, etc., would be present at the Defendant's residence.

The evidence sought included "property which may identify or trace the victim or suspects," "samples of materials the subjects may have carried from the scene on their person," "blood," "hair," and "skin flakes." An application of the factors articulated in *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985)—i.e. "the type of crime being investigated, the nature of the things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places"—supports the inference that evidence of this type would be found in a person's residence. The police were investigating a homicide known to have been committed using a firearm, a crime that produces various kinds of trace evidence. For instance, when bullets hit the human body, the resulting wound produces a fine mist of blood splatter, see Louis L. Akin, *Blood Spatter Interpretation at Crime and Accident Scenes: A Basic Approach*, FBI L. ENFORCEMENT BULL., Feb. 2005, at 21, 22, which attaches to the clothing of an individual standing close-by the victim without such matter being observable by human eyes. DNA analysis of blood transferred in such a way can connect

14

perpetrators to victims.[4]  If the perpetrators come into physical contact with their victim, skin,

hair, and other trace materials from the victim can be transferred to the perpetrators.[5]  Among the

items sought were "property which may identify or trace the victim or suspects" and  "samples of

materials the subjects may have carried from the scene on their person."  These property items or

materials could include clothing and shoes, which as stated above, could conceivably have had

trace evidence attached to them.  Further, it is permissible to infer that clothing would be exactly

the type of item kept at the residence of a perpetrator as people typically keep their clothing in

their homes.  *See, e.g., United States v. Ray*,  No. 06-4747, 2007 WL 2116463, at *2 (4th Cir.

July 24, 2007)(per curiam)(holding that although two months had passed since homicide, "[e]ven

without the direct nexus of the vehicle, the list of items sought for seizure included things—such

as clothing, fibers, blood, and hair—which an issuing judge could always reasonably infer would

be at a suspect's residence").  While the capabilities of forensic scientists to discover and collect

---

[4] "The results of DNA testing on evidence samples [can be] compared with the results of DNA analysis of reference samples collected from known individuals.  Such analyses can associate victims and suspects with each other, with evidence items, or with a crime scene." FED. BUREAU OF INVESTIGATION, HANDBOOK OF FORENSIC SERVICES 33-34 (Kim Waggoner ed., 2007).

[5]According to the Federal Bureau of Investigation:

trace materials [can] be transferred during the commission of a violent crime. These trace materials include human hair, animal hair, textile fibers and fabric, rope, feathers, wood, soil, glass, and building materials. The physical contact between a suspect and a victim can result in the transfer of trace materials. The identification and comparison of these materials can often link a suspect to a crime scene or to physical contact with another individual. Torn pieces of fabric can be positively associated to a damaged garment . . . .

Federal Bureau of Investigation, Laboratory Services, http://www.fbi.gov/hq/lab/html/teu1.htm.

trace evidence are widely known, and perpetrators may now be more wary of such scientific techniques, it is still reasonable to infer that a suspect fleeing a crime scene would at some point retreat to his or her home, raising the possibility that trace evidence will be transferred from the crime scene to items in the home.

### 3.  Staleness

In his supplemental brief, Defendant asserts that, because more than two weeks had passed between the time of the homicide and the time the search warrant was issued, probable cause no longer existed that evidence of the homicide would be found at 855 Byron Avenue. "[W]hether information contained in an affidavit is stale 'must be determined by the circumstances of each case.'" *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)(quoting *Sgro v. United States*, 287 U.S. 206, 211 (1932)). Factors to consider in evaluating whether information is stale include the "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc. " *Id.* (internal quotations omitted). Applying these factors to the instant case—keeping in mind the deferential standard the Court must apply in reviewing the probable cause determination of the municipal judge—the Court declines to invalidate the warrant based on a time lapse of only seventeen days. While a homicide case is best viewed as a single occurrence as opposed to an ongoing criminal enterprise, given the types of evidence permissibly sought by the police in this case, including clothing, blood, DNA, fibers, etc., it is not unreasonable for the municipal judge to have concluded that this evidence could still be found at the residence of Defendant within seventeen days of the

16

homicide. *See, e.g., United States v. Rosenbarger*, 536 F.2d 715, 720 (6th Cir. 1976)("The assumption that stolen goods delivered to a particular place will be there a mere twenty-one days later is eminently reasonable.").

### E.     GOOD FAITH EXCEPTION TO EXCLUSIONARY RULE

Even if the affidavit was not sufficient to establish probable cause, the exception to the exclusionary rule announced by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984), would apply in this case. In *Leon*, the Court concluded that "the marginal or nonexistent benefits produced by suppressing evidence obtained in *objectively reasonable reliance* on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922 (emphasis supplied). The good faith exception to the exclusionary rule announced in *Leon* does not apply in the following four instances:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006). As explained above in the Court's discussion of Defendant's *Franks* arguments, there is no evidence that Detective Mounts provided information in the affidavit that he knew was false or that he provided such information with reckless disregard for the truth. Further, there is no evidence that the municipal judge served as a mere rubber stamp for the police or that the warrant itself was facially defective. The

remaining issue then becomes whether in this case "the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." The Court finds that the affidavit was not so lacking.

"[A] determination of good-faith reliance, like a determination of probable cause, must be bound by the four corners of the affidavit." *United States v. Laughton*, 409 F.3d 744, 751 (6th Cir. 2005). Stated another way, "[w]hether an objectively reasonable officer would have recognized that an affidavit was so lacking in indicia of probable cause as to preclude good faith reliance on the warrant's issuance can be measured only by what is in that affidavit." *Id.* at 751- 52. Thus, in deciding whether the good-faith exception applies, the Court cannot consider information that the Columbus police officers may have learned from Tamara Smith or April Vizcarra that does not appear in the affidavit.[6]

The issue of whether the affidavit was so lacking in indicia of probable cause as to render reliance upon it by the police entirely unreasonable turns on whether the affidavit itself establishes some minimal nexus between 855 Byron Avenue and the evidence sought. A finding of good faith reliance requires "a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place." *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004)(en banc)(quoting *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002)). The Sixth Circuit has "found *Leon* applicable in cases where [the Court]

---

[6]The Court notes that the holding in *Laughton* was modified by the panel in *United States v. Frazier*, 423 F.3d 526 (6th Cir. 2005), which concluded that "information that was known to the officer and revealed to the issuing magistrate" but not necessarily included within the affidavit could be considered by a court in making a determination under *Leon*. *Id.* at 535-36. Here, however, no evidence has been presented that information other than what is contained in the affidavit itself was presented to the magistrate. Accordingly, the Court will limit its review to the affidavit itself.

determined that the affidavit contained a minimally sufficient nexus between the illegal activity

and the place to be searched to support an officer's good-faith belief in the warrant's validity,

even if the information provided was not enough to establish probable cause." *Carpenter*, 360

F.3d at 596.  Under the lower standard applicable to reasonable reliance analysis, the affidavit's

identification of 815 Byron Avenue as Defendant's residence provided such a "minimally

sufficient nexus" as it would be objectively reasonable to infer that items such as clothing, which

may have contained trace evidence linking Defendant to the homicide, would be located at an

individual's residence.

    **F.**    **PLAIN VIEW DOCTRINE**

    Having found that the affidavit supported a finding of probable cause to search 855 Byron

Avenue for so-called "forensic" evidence connecting Defendant to the homicide, or in the

alternative, that the affidavit was sufficient to permit good faith reliance under *Leon*, the Court

must determine if the police officers legally seized the AK-47 despite the fact that the affidavit

may not have supported a search for weapons used in the homicide.  The so-called "plain view"

exception to the Fourth Amendment's warrant requirement allows police to seize evidence in

situations "in which the police have a warrant to search a given area for specified objects, and in

the course of the search come across some other article of incriminating character." *Coolidge v.*

*New Hampshire*, 403 U.S. 443, 465 (1971).  The "plain view" exception also is applicable in

cases where some other exception to the Fourth Amendment warrant requirement has allowed the

police to enter the area where evidence is found.  *See id.* ("Where the initial intrusion that brings

the police within plain view of such an article is supported, not by a warrant, but by one of the

recognized exceptions to the warrant requirement, the seizure is also legitimate.").

For the plain view doctrine to be applicable, the following four factors must be met: "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007)(citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). Here, as the AK-47 was discovered in a bedroom closet (see Doc. 47, Attach. 1, 2), the Court finds that the elements of the plain view doctrine are met. As previously held, the police had a valid warrant allowing them to search the 855 Byron Avenue address for forensic evidence, such as gunshot residue or blood spatter that could conceivably have been found on clothing belonging to Defendant. In the search for clothing, the police could legitimately open the closet. Once the closet was opened, the rifle was in plain view on the closet shelf. Thus, the evidence was in plain view from a place (the closet) where the police were legally present and the police had the right to access that place. Finally, the incriminating nature of the AK-47 was immediately apparent, as the police were investigating a homicide involving a firearm.

In the supplemental briefing requested by the Court, Defendant apparently contests whether the AK-47 actually was visible on the closet shelf. While Defendant has offered no evidence to support this claim, even if the AK-47 was more carefully hidden, the plain view doctrine would still have permitted its seizure by the police. That is because the nature of the evidence permissibly sought by the police, e.g. trace evidence, would likely have allowed them access to the location of the rifle.

### III.

Defendant has not produced evidence that the police used knowingly false information in

20

the affidavit or acted with a reckless disregard for the truth.  Furthermore, the statements that 855

Byron Avenue was the residence of Defendant and that a DNA match had occurred provided a

sufficient nexus from which the municipal judge could infer that at least some of the types of

evidence sought would be found at that address, and the seizure of the AK-47 fell within the

parameters of the plain view doctrine.  In the alternative, good-faith reliance on the affidavit and

search warrant was permissible.  For the foregoing reasons, Defendant's Motion to Suppress

Evidence (Document 30) is **DENIED.**

    **IT IS SO ORDERED.**

6-14-2010
_____        _____
**DATED**                                                **EDMUND A. SARGUS, JR.**
                                                **UNITED STATES DISTRICT JUDGE**